IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

v.

JASON VOTROBEK,
JESSE VIOLANTE,
ROLAND CASTELLANOS,
TARA ATKINS, and
DR. JAMES CHAPMAN,

        Defendants.

CRIMINAL ACTION FILE

NO. 4:11-CR-022-RLV-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Roland Castellanos's Motion to

Suppress Statement [90] and Motion to Suppress Items Seized [91].  The Court

conducted an evidentiary hearing on those motions on May 1, 2012 [105], which has

been transcribed  [110].  The parties have briefed the issues.  (See Def.'s Br. Supp.

[113]; Gov't Resp. [120].)  On the basis of the testimony and evidence produced at the

hearing, the undersigned **REPORTS** that law enforcement complied with the

requirements of Miranda v. Arizona, 384 U.S. 435 (1966), and that, under the totality

of the circumstances, any incriminating statement that defendant may have made to

law enforcement during the interview at Atlanta Medical Group, Incorporated ("AMG") was noncustodial and voluntary. Likewise, the undersigned **REPORTS** that agents did not violate the Fourth Amendment when searching Mr. Castellanos's attaché bag because it fell within the scope of a valid search warrant for the premises; thus, items recovered from its search are also admissible. Accordingly, the undersigned **RECOMMENDS** that the instant Motions be **DENIED**.

## I.  STATEMENT OF FACTS

### A.  The Investigation

In May 2010, the Bartow County Sheriff's Office ("BCSO") contacted Georgia Bureau of Investigation Special Agent In Charge Ken Howard for assistance investigating AMG. (Tr. 6-8.) Agent Howard is assigned to the Drug Enforcement Administration's ("DEA") regional office in Canton, Georgia. (Id. at 7.)

In June 2010, Agent Howard became involved in the investigation of AMG, assisting Agent Nathan Gibbs of the BCSO Drug Task Force with surveillance of AMG, including gathering intelligence on its owners and shareholders and determining if criminal activity was taking place there. (Tr. 8, 69-71.) Agent Howard determined that the majority of the activity taking place at the clinic was illegal and contacted the

2

DEA's pharmaceutical-diversion group. (Id. at 8-9.)[1] The DEA assigned Agent April Whitesell, a diversion investigator, to the case. (Id. at 58-59.) The DEA determined that a Title III wiretap was necessary to investigate certain members of AMG, including Mr. Castellanos, and launched a multi-agency investigation. (Id. at 9, 59.)[2]

While investigating AMG, Agent Howard learned that a high percentage of its clientele had criminal histories (arrests and convictions) for crimes such as drug trafficking, pharmaceutical diversion, armed robbery, and aggravated assault. (Tr. 10-11; see also id. at 40, 71.) Based on surveillance and follow-up intelligence, Agent Howard determined that the people visiting the clinic were there to obtain pharmaceuticals such as Oxycodone and Xanax, or were the transporters, drivers, or associates of people purchasing pharmaceuticals. (Id. at 11.)

Agent Howard also learned that at least two employees of AMG, Jason Votrobek and Dr. James Chapman (both co-defendants in this case), had carried firearms in the past. (Tr. 11; see also id. at 71.) Agent Howard testified that Mr. Votrobek had a prior weapons-related offense for brandishing a handgun in front of a family member and

---

[1] Under the circumstances here, "diversion" refers to legal pharmaceutical drugs which are diverted into the illicit market. (Tr. 59.)

[2] The Court authorized several wiretaps relating to the AMG investigation; the last wiretap of Mr. Castellanos's telephone began on June 6, 2011. (Tr. 59.)

AO 72A
(Rev.8/82)

an employee.  (<u>Id.</u> at 11; <u>see also</u> <u>id.</u> at 41.)  Likewise, Dr. Chapman had informed an officer during a traffic stop that he had a permit to carry a pistol and that he frequently carried it on his person or in his vehicle.  (<u>Id.</u> at 12; <u>see also</u> <u>id.</u> at 42, 71.)

**B.    <u>The Search Warrant</u>**

On June 3, 2011, United States Magistrate Judge E. Clayton Scofield issued a search warrant to Special Agent Lourdes M. Bowen of the DEA authorizing a search of AMG.  (Gov't Ex. 9 [106].)  The search warrant authorized seizure of the following: all controlled substances and related funds and forms (including records of orders, purchases, prescriptions, and dispensing); electronic communication devices and computers; records related to medical examinations and patient treatment; records of financial activities; electronically stored or computer-generated documents reflecting patient information, medical records, billing, payment, and financial records; records related to medical tests/results, appointments, and insurance; address/telephone books and papers with contact information of co-conspirators and individuals or businesses with whom they had a financial relationship; indicia of occupancy or ownership of the AMG premises (e.g., utility bills, lease agreements, and keys); business records (e.g., receipts, ledgers, and invoices); personal books, records, writings, receipts, and other documents regarding acquisition, transfer, or concealment of currency; records related

4

to the purchase of business or personal assets; tax records; and correspondence relating to AMG (including emails, notes, and work papers). (Id.)

## C. **Execution Of The Warrant**

On June 7, 2011, Agent Howard and a team of law-enforcement officials executed the search warrant. (Tr. 9-10 & Gov't Ex. 9.) Because there was a possibility that persons in AMG might be armed, Agent Howard decided that a raid team clearly marked as law enforcement would enter AMG first to secure the premises. (Id. at 12.)[3] Six officers, including Agent Gibbs, entered the clinic at 10:15 a.m. with guns drawn. (Id. at 12, 43, 72-73, 86, 88 & Gov't Ex. C; see also Tr. 62.)[4] Most members of the entry team, including Agent Gibbs, wore tactical vests emblazoned with "DTF Agent/Police" on the front and back. (Id. at 75.)

The entry team split into two groups; one group proceeded down the left hallway toward the physician offices, and the other entered the waiting area on the right and advanced to the employee break room. (Tr. 73-74.) As he walked down the clinic's

---

[3] Prior to entering AMG on June 7, 2011, the agents strongly suspected that Mr. Votrobek was not at the clinic that day. (Tr. 41.) However, they assumed that Dr. Chapman (who was present) was armed. (Id. at 42.)

[4] The search team totaled more than twelve officers, including Agent Whitesell. (Tr. 43, 60-61; cf. at 87 (Agent Gibbs testified that ten to fifteen officers participated in the entry).)

left hallway, Agent Gibbs announced in a loud voice: "Let me see your hands. Let me see your hands. Search warrant. Let me see your hands." (Id. at 74-75; see also id. at 88-89.)[5] Other members of the entry team announced: "Police. Search Warrant." (Id. at 75.) An officer gave the "all clear" signal within one and a half minutes after entry, and the officers holstered their weapons. (Id. at 75-76, 86-88 & Gov't Ex. C.) Shortly thereafter, officers escorted clinic patrons outside. (Id. at 89.)

As some entry team members were leaving, Agent Howard entered the clinic (approximately one to two minutes after the initial entry). (Tr. 13-14; see also id. at 46.)[6] He entered through the front door and saw clients sitting in a primary waiting room watching television and employees standing in a reception area and in office doorways. (Id. at 13-15; see also id. at 16, 45, 78.) Agent Howard walked through the entire clinic via its main hallway (a horseshoe shape); while doing so, he saw more

---

[5] Once the entry team had secured AMG, Agent Gibbs's duty was to locate Tara Atkins and, if she consented, conduct an interview. (Tr. 73; see also id. at 76-77.)

[6] Once the entry team had secured AMG, Agent Howard's primary role was to inform other law-enforcement officers (simultaneously executing five or more search warrants in Florida and other Georgia locations) which suspects were present at the clinic. (Tr. 12-13.) Agent Howard's second duty was to locate Mr. Castellanos (AMG's facility director) and, if he consented, conduct an interview. (Id. at 13, 30; see also id. at 18, 77.)

6

patients in a secondary waiting area. (<u>Id.</u> at 14-16 & Gov't Ex. 1.)[7]  The other officers

participating in the search began their assigned tasks, which included taking photos,

videotaping the search, accounting for all persons present in the clinic, and conducting

interviews.  (<u>Id.</u> at 76-79, 85-86 & Gov't Ex. C.)

When patients asked Agent Howard what was happening, he told then that the

officers had a search warrant for the property and would like to have "general

conversations" with them. (Tr. 17.)  A patient asked Agent Howard if he could leave.

(<u>Id.</u> at 17; <u>see also</u> <u>id.</u> at 46.)  Agent Howard stated that the patient could do so, but that

he (Agent Howard) would prefer that the patient, if willing, speak with an officer first.

(<u>Id.</u> at 17.)  Some patients consented to searches, and some of those were arrested

based on drug-related charges, including possession of marijuana, controlled

substances, and/or pills outside the original container.  (<u>Id.</u> at 46, 84-85, 89.)

Agent Howard then went outside the clinic to place telephone calls and speak

with other officers. (Tr. 17.)  Those activities took ten or fifteen minutes.  (<u>Id.</u> at 17-

18.)  When Agent Howard re-entered the clinic, he found Mr. Castellanos standing in

the employee portion of the reception area.  (<u>Id.</u> at 18-19 & Gov't Ex. 2; <u>see also</u> <u>id.</u>

---

[7] Agent Howard also saw clinic clients standing in an outside smoking area.  (Tr. 45.)

AO 72A
(Rev.8/82)

at 46.)[8]  Agent Howard showed his credentials to Mr. Castellanos and identified himself.  (Id. at 19-21.)  Agent Howard reminded Mr. Castellanos that they had spoken on the telephone several months prior; Mr. Castellanos seemed to recall that conversation.  (Id. at 19-20.)[9]  Agent Howard told Mr. Castellanos that the officers had a search warrant for the clinic and asked if he would agree to discuss the business.  (Id. at 20; see also id. at 47.)  Mr. Castellanos agreed, and Agent Howard asked if they could speak in one of the clinic offices.  (Id. at 47.)  Mr. Castellanos pointed to Physician's Room 1.  (Id. at 21, 47 & Gov't Ex. 7; see also id. at 47.)

### D.  Interview Of Mr. Castellanos

Mr. Castellanos entered the room; Agent Howard followed him and asked if he had any weapons, drugs, or anything illegal on his person.  (Tr. 22.)  Mr. Castellanos answered in the negative and began to empty his pockets onto the desk in the room (items removed included a cellular telephone, change, car keys, and a pen).  (Id. at 22;

---

[8] According to Agent Howard, Mr. Castellanos was not carrying an attaché bag when they met.  (Tr. 23; see also id. at 48.)  However, Mr. Castellanos was working at AMG that day.  (Id. at 30.)

[9] At some point during the preliminary investigation of AMG, Mr. Castellanos contacted Agent Howard regarding AMG's operating practices.  (Tr. 44.)  It appeared to Agent Howard that Mr. Castellanos was "fishing for information . . . as to whether or not the clinic was under investigation or whether [Mr. Castellanos] himself was under investigation for criminal activity."  (Id.)

see also id. at 47, 49.)[10] Agent Howard did not seize those possession; rather, he asked Mr. Castellanos for permission to search his person; defendant agreed. (Id. at 22-23; see also id. at 47, 50.) Agent Howard patted him down for weapons (without reaching into his pockets) and told Mr. Castellanos that he could put away his possessions. (Id. at 22; see also id. at 47.) Agent Howard stepped out of the room to receive a telephone call and to get a digital recorder in order to document the interview. (Id. at 22, 24-25, 27; see also id. at 51.)

Agent Howard left the door to the room open and asked a BCSO deputy who was standing in the hallway to observe Mr. Castellanos to "[m]ake sure he [did not] do anything crazy," meaning hurt himself or destroy evidence that might be in the room. (Tr. 23-24.) The deputy remained in the hallway and did not block the entrance to the room. (Id. at 24.) Agent Howard did not instruct the deputy to keep Mr. Castellanos in the room and did not instruct Mr. Castellanos to remain there. (Id. at 25.) Agent Howard was absent for five to ten minutes. (Id.) When Agent Howard returned, Mr. Castellanos was still in the room. (Id.) The deputy who had been watching Mr. Castellanos stated that he had been talking on the telephone. (Id. at 26; see also id. at

---

[10] Agent Howard did not recall seeing Mr. Castellanos remove a wallet, and testified that, regardless, he did not take Mr. Castellanos's wallet. (Tr. 49.)

9

61-62.) Agent Howard told a DEA agent to notify the officers monitoring Mr. Castellanos's telephone calls. (Id. at 26.)[11]

Agent Howard returned to the room with Special Agent James Harder of the Federal Bureau of Investigation to interview Mr. Castellanos. (Tr. 27.) Approximately thirty to forty minutes had passed between the time the officers entered the clinic and the start of the interview at 10:55 a.m. (Id. at 55; see also id. at 62 (estimating forty-five minutes had passed) & Gov't Ex. A.) Agent Howard recorded the interview, but he did not Mirandize Mr. Castellanos or arrest him. (Id. at 27-29 & Gov't Ex. A; see also id. at 50, 60 (Agent Whitesell also did not Mirandize him).)

The agents sat at a desk opposite Mr. Castellanos; Agent Whitesell joined the interview early on. (Tr. 28, 60, 90 & Gov't Ex. A.)[12] Agent Howard stated that Mr. Castellanos was not under arrest and that the interview was free and voluntary, but did not explicitly tell Mr. Castellanos that he was free to leave. (Id. at 52, 55.) Agent Howard explained to Mr. Castellanos that the officers had a search warrant for the clinic and that they had been investigating AMG for a year. (See Gov't Ex. A.) He

---

[11] Agents were monitoring Mr. Castellanos's telephone calls that day via a wiretap. (Tr. 59-60.)

[12] Initially, Agent Whitesell interviewed Dr. Chapman; she left that interview to assist Agent Howard in Mr. Castellanos's interview. (Tr. 60; see also id. at 77.)

10

informed Mr. Castellanos that other search warrants were being executed that day, including at Mr. Castellanos's apartment (where his mother was located).  (See id.)[13] The three agents then interviewed Mr. Castellanos.  (See id.)  In Agent Howard's opinion, Mr. Castellanos understood that he was free to leave and appeared comfortable with the situation.  (Tr. 53.)

During the interview, Agent Howard left the room repeatedly to make and receive telephone calls or text messages in order to exchange newly developed information with agents who were executing related search warrants.  (Tr. 30-31 & Gov't Ex. A.)  Likewise, Mr. Castellanos's cellular telephone phone rang several times during the interview.  (Tr. 33; see also id. at 62-63.)  At one point, Agent Howard told Mr. Castellanos that he could place or answer a telephone call, which he did.[14]  (Id. at 34; see also id. at 51, 54.)  Agent Howard took that opportunity to ask an officer in the hallway to bring water for himself, Mr. Castellanos, and Agent Whitesell.  (Id. at 34; see also id. at 54.)

_____

[13] Mr. Castellanos told Agent Howard that his mother had high blood pressure. (Tr. 29; see also id. at 54-55.)

[14] Mr. Castellanos retained possession of his cellular telephone during the interview.  (Tr. 34.)

During the interview, Agent Howard also left the room to speak with another officer (either Agent Gibbs or Captain Mayton), who was executing the search warrant at AMG, regarding items discovered at the clinic. (Tr. 31.) Additionally, Agent Gibbs told Agent Howard that he had found either crystal methamphetamine or cocaine and a suspected ecstasy pill in an attaché bag that the agents believed belonged to Mr. Castellanos.[15] (Id. at 32.) Later, Agent Gibbs returned to the interview room and asked Mr. Castellanos for his car keys; defendant complied. (Id. at 34; see also id. at 49-50, 83, 91.) Agent Howard asked Mr. Castellanos if there was anything illegal in the car and if the officers could search it; Mr. Castellanos stated that there was not and gave the officers permission to search the car. (Id. at 34.)[16]

The agents interviewed Mr. Castellanos for just over an hour, concluding at 12:18 p.m. (Tr. 36 & Gov't Ex. A; see also Tr. 55, 62.) At no time during that interview did the agents tell Mr. Castellanos that he had to stay at AMG, or threaten, shout at, or display a firearm to him. (Id. at 35, 39, 60; see also id. at 42, 57.) None

---

[15] Agent Gibbs found the attaché bag in Mr. Castellanos's office at the clinic. (Tr. 32-33.) Agent Howard had seen Mr. Castellanos carry the bag to and from work during the surveillance of AMG. (Id. at 32-33.) When executing the warrant, officers did not obtain Mr. Castellanos's permission to search his attaché bag. (Id. at 48.)

[16] Agent Howard testified that the officers had a warrant to seize and search Mr. Castellanos's car. (Tr. 34.)

12

of the agents made any promises to Mr. Castellanos, nor did they place him in handcuffs, arrest him, or touch him after the initial pat down, except to shake his hand. (Id. at 35-36, 38, 60, 65, 85.) Immediately following the interview, Mr. Castellanos asked the officers if he could use the restroom. (Id. at 36.) Agent Howard stated yes; however, because he had not searched the bathroom or Mr. Castellanos, Agent Howard waited at the door inside the restroom. (Id. at 36-37, 50, 55-56.)[17]

## E. Search of Mr. Castellanos's Attaché Bag

Upon completing his interview of Ms. Atkins (which lasted approximately thirty to forty-five minutes), Agent Gibbs rejoined the search team. (Tr. 78-79.) He searched Mr. Castellanos's office, including a black attaché bag sitting on a cart. (Id. at 79-80, 93 & Gov't Ex. 3.)[18] Inside the bag, Agent Gibbs found business cards for Crown Roland (one of Mr. Castellanos's businesses), a clear plastic bag containing a

---

[17] At some point after the interview, Mr. Castellanos went outside the clinic to smoke. (Tr. 51.) Agent Howard saw him smoking with other AMG employees and patients. (Id.) At that time, officers were in the clinic parking lot searching vehicles and interviewing patients. (Id.)

[18] Agent Gibbs searched the attachéd bag based on the warrant's directive to locate financial documents, patient files, and records; he suspected such documents might be in the bag. (Tr. 83, 91.) He did not seek consent from Mr. Castellanos to search the bag. (Id. at 91-92.)

13

white crystal-like substance, and a blue plastic bag containing a suspected ecstasy pill. (Tr. 80-82, 91 & Gov't Exs. 4 & 5.)

**F.**   **Events After The Interview**

Approximately twenty minutes after the interview with Mr. Castellanos ended, he placed a telephone call to a female friend.  (Tr. 63-64 & Gov't Ex. B.)  During that call, Mr. Castellanos stated that the officers had asked him questions and had told him that he was not under arrest.  (See Gov't Ex. B.)  He also stated that the agents "are basically holding me," that he did not think he could leave the premises, and that he was not going to try to leave.  (See id.)

AO 72A
(Rev.8/82)

Several hours (possibly four or five hours) after officers entered the clinic, an AMG employee who was standing in the clinic's break room asked Agent Howard if she could leave the premises. (Tr. 37, 39-40; see also id. at 56-58.) Agent Howard told the employee that everyone could leave, but that he would prefer for someone to remain at the clinic or return to it in order to lock the building after the officers had completed the search. (Id. at 38, 40; see also id. at 56-57.)[19] Mr. Castellanos was standing near that employee in the break room; he appeared to be listening to the conversation. (Id. at 37-38; see also id. at 56-57.) Indeed, Mr. Castellanos left AMG without asking Agent Howard for permission and before the officers completed the search. (Id. at 38-39; see also id. at 92.)

---

[19] Agent Howard testified that, when searching a business, he prefers for an employee be present in order to inform that person as to what is being taken, to answer questions by the officers regarding issues that may arise during the search, and to lock the business after the search is complete to ensure the safety of the remaining items. (Tr. 38.)

15

## II.    **THE INDICTMENT**

On June 29, 2011, the grand jury returned an eight-count Indictment [1] charging defendants with drug-conspiracy and money-laundering offenses (and seeking forfeiture of cash and property). The first six paragraphs of the Indictment provide relevant background, introducing the Controlled Substances Act ("CSA") and its Schedules (id. ¶ 1); outlining the classification of various prescription drugs as controlled substances based on their potential for abuse (id. ¶ 2); describing the requirement that Schedule II controlled substances be dispensed or distributed only by prescription from a licensed practitioner holding a registration number from the DEA allowing that activity (id. ¶ 3); stating that under Federal regulations, in order for a prescription for a controlled substance to be valid, it must be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice (id. ¶ 4); explaining that an order that purports to be a prescription but is not issued in the course of professional treatment or for legitimate and authorized research is not a prescription within the meaning of the CSA, and that the person who issued it violated 21 U.S.C. § 841(a)(1) (id. ¶ 5); and showing that Oxycodone, an opiate, and Percocet, Percodan, and Oxycontin, brand names of prescription drugs that contain Oxycodone, are Schedule II controlled substances (id. ¶ 6).

The next two paragraphs of the Indictment introduce the defendants. Dr. Chapman worked for the AMG, was registered with the DEA under the provisions of the CSA as a practitioner, and was assigned a DEA registration number that authorized him to write prescriptions for Schedule II controlled substances. (Indict. ¶ 7.) Defendant Votrobek was the principal owner of AMG and was directly involved in its operations. (Id. ¶ 8.) Defendant Violante had an unspecified ownership interest in AMG and participated in its operations. (Id.) Defendant Castellanos was the Facility Director, in which capacity he oversaw the clinic's day-to-day operations. (Id.) Defendant Atkins worked as AMG's Office Manager and was involved in all aspects of the clinic's operations, including patient intake, dispensing pills, and monitoring the doctors' work activities. (Id.) Finally, the Indictment alleges that defendants Votrobek, Violante, Castellanos, and Atkins are not medical doctors authorized to practice medicine. (Id.)

The introductory section of the Indictment concludes with the assertion that AMG operated on a cash-only basis and did not accept insurance from patients. (Indict. ¶ 9.) Further, AMG allegedly sold and dispensed Oxycodone on site at substantially marked-up prices. (Id.)

17

Count One, labeled "Drug Conspiracy," begins at paragraph 10 and incorporates the preceding paragraphs. (See Indict. ¶ 10.) Paragraph 11 of the Indictment reads as follows:

> Beginning in or about May 2010 and continuing until on or about May 24, 2011, within the Northern District of Georgia, the defendants, JASON VOTROBEK, JESSE VIOLANTE, ROLAND CASTELLANOS, TARA ATKINS, and DR. JAMES CHAPMAN, did knowingly combine, conspire, confederate, agree and have a tacit understanding with others known and unknown to the Grand Jury to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally distribute and dispense controlled substances in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C). Said conspiracy involved Oxycodone, a prescription drug designated as a Schedule II controlled substance, which was distributed and dispensed for other than a legitimate medical purpose and not in the usual course of professional practice.

(Id. ¶ 11.)[20]

After a heading which states, "Ways, Manners and Means of the Conspiracy," the Indictment asserts that the "purpose of the conspiracy" was to sell as many

---

[20] Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally–(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 846 provides as follows: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Section 841(b)(1)(C) sets the penalties for violating § 841(a)(1) in the case of, inter alia, a Schedule II controlled substance.

Oxycodone pills as possible, irrespective of any legitimate medical purpose for prescribing them, to generate windfall profits. (Indict. ¶ 12.) To accomplish that purpose, the Indictment alleges that Dr. Chapman, with the knowing involvement and participation of Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, would distribute and dispense Oxycodone for other than a legitimate medical purpose and not in the usual course of professional practice, thus "causing, aiding, abetting, and facilitating the misuse, abuse, and further distribution of the controlled substance." (Id.) AMG, under the governance and at the direction of Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, would then "dispense the prescribed pills on site for a price that generated a high profit margin." (Id.)

The Indictment asserts that, as part of the conspiracy, Dr. Chapman would prescribe Oxycodone at a patient's first appointment "without conducting a neurological and physical examination that was appropriate to the patient's complaint," and thus made no legitimate diagnosis justifying that prescription. (Indict. ¶ 13.) Further, the Indictment alleges that Dr. Chapman would prescribe Oxycodone "in amounts and dosage combinations that exceeded that required for legitimate medical treatment." (Id.) At later follow-up visits, Dr. Chapman would write "additional prescriptions without further medical evaluations, or with limited medical evaluation,"

19

that was required to continue writing prescriptions at the dosages indicated on the prescriptions. (Id.)

The Indictment next alleges that Dr. Chapman continued prescribing controlled substances after ignoring "obvious indications that people were abusing, misusing, and distributing the prescribed drugs." (Indict. ¶ 14.) The clinic serviced an "extreme number of patients, most visiting from out-of-state." (Id.) Many patients, in turn, distributed pills distributed by AMG. (Id.)

The Indictment further alleges that, as part of the conspiracy, Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, "together, monitored and directed Dr. Chapman with respect to the number of patients that he examined." (Indict. ¶ 15.) According to the charging document, on at least one occasion when Dr. Chapman was unable to do so himself, Ms. Atkins, with the knowledge and participation of Mr. Castellanos, "took steps to facilitate" the prescribing of Oxycodone to patients, even though she was not a doctor. (Id.)

The Indictment alleges that, as part of the conspiracy, Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, together, monitored law enforcement actions directed at other facilities like AMG, that were illegally prescribing and dispensing controlled narcotics, to develop practices and procedures to avoid AMG's being

20

detected and targeted by law enforcement. (Indict. ¶ 16.) When it was determined, for example, that operating as a cash-only business might be a factor in being targeted by law enforcement, Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, together, began to "take steps to transition into accepting insurance from patients." (Id.)

In the last paragraph of this section, the Indictment alleges that patients at AMG falsified drug screens, including bringing to the clinic condoms containing urine. (Indict. ¶ 17.) Non-medical personnel assisted with standard medical practices, including taking patients' blood pressure. (Id.) Patients paid for staff members' lunches and, at times, directly bribed AMG for access to the clinic. (Id.) Many patients had visible signs of being drug addicts. (Id.) According to the grand jury, Dr. Chapman, Messrs. Votrobek, Violante, Castellanos, and Ms. Atkins, knowingly sanctioned these business practices.

Counts Two through Eight of the Indictment allege various money-laundering offenses in violation of 18 U.S.C. §§ 1956 or 1957 against defendants Votrobek, Violante, Castellanos, and Atkins (Counts Two and Three); defendants Votrobek, Violante, and Castellanos (Count Four), defendants Votrobek and Violante (Counts Five and Seven), and defendant Castellanos (Counts Six and Eight).

## III. CONTENTIONS OF THE PARTIES

Mr. Castellanos argues that the search of his attaché bag exceeded the scope of the warrant (which he characterizes as authorizing the seizure of controlled substances); therefore, any evidence found therein must be excluded. (Def.'s Br. Supp. 3-5.)[21] Likewise, he contends that the statement he made during the June 7, 2010 interview must be suppressed because the agents failed to Mirandize him and he was effectively in custody under the totality of the circumstances. (Id. at 6-7.)

The Government responds that many of the items expressly identified in the search warrant were likely to be found in an attaché bag; therefore, the controlled substances found therein are admissible. (Gov't Resp. 15-18.) Likewise, the Government argues that Mr. Castellanos's statements are admissible because he was not in custody at the time and voluntarily spoke with the agents. (Id. at 18-32.) The undersigned addresses each issue in turn below.

---

[21] Mr. Castellanos does not challenge the lawfulness of the search warrant or the underlying affidavit. (See Def.'s Br. Supp. 3.) He does, however, complain that Ms. Atkins's purse was not searched, while AMG patients were searched. (Id. at 4.) Those facts are irrelevant to the instant Motions.

AO 72A
(Rev.8/82)

## IV. DISCUSSION

### A. Search Of The Attaché Bag Was Within The Warrant's Scope

The Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized," U.S. Const. amend. IV, in order to guard against "general exploratory searches," United States v. Khanani, 502 F.3d 1281, 1289 (11th Cir. 2007). "If a search exceeds the scope of the terms of a warrant, any subsequent seizure is unconstitutional." United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir.1997) (per curiam).

The scope of the search generally includes any area where the items in question may be found and "is generally not limited by the possibility that separate acts of entry or opening may be required to complete the search." Jackson, 120 F.3d at 1228. For example, in United States v. Gonzalez, 940 F.2d 1413 (11th Cir. 1991), the Eleventh Circuit determined that, based on a residential search warrant authorizing the seizure of documents and currency related to the illegal distribution of controlled substances, officers could search a locked briefcase inside the home even though it did not belong to the homeowner. See id. at 1420.

Here, in addition to controlled substances, the search warrant particularly authorized, inter alia, the seizure of documents, journals, and receipts related to

23

AMG's financial/business activities, accounts, and relationships; indicia of occupancy, including bills and keys; insurance records; personal records, writings, and receipts showing the acquisition, concealment, or transfer of currency; records relating to the purchase of business or personal assets; tax records; and correspondence, work papers, or notes relating to AMG. (<u>See</u> Gov't Ex. 9.) An attaché bag could easily contain such items. Moreover, given his position as AMG's facility director, Mr. Castellanos likely carried some of the above items in his attaché bag to and from his office at AMG (although Agent Gibbs did not know whose bag or office he was searching at the time). <u>See</u> <u>United States v. Young</u>, 909 F.2d 442, 445 (11th Cir.1990) (stating "that the usual occupant of a building being searched [by a warrant] would lose a privacy interest in his belongings located there"). Thus, the search warrant (which Mr. Castellanos concedes was valid) provided sufficient authorization for the search of the attaché bag located in an AMG office, and the items recovered from it are admissible at trial. Accordingly, the undersigned **RECOMMENDS** that Mr. Castellanos's Motion to Suppress Items Seized be **DENIED**.

AO 72A
(Rev.8/82)

**B. Defendant's Statements Were Noncustodial And Voluntary**

The Fifth Amendment provides in relevant part that, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court explained that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." <u>Id.</u> at 478. Therefore, in order for a custodial statement to be admitted as evidence, the person to be interrogated first must be advised that (1) the government may use that statement against him to secure a conviction, (2) he has the right to remain silent, and (3) he has the right to counsel. <u>Id.</u> at 468-70.

Those "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). It is undisputed that the officers did not arrest Mr. Castellanos or Mirandize him before or during the June 7, 2011 interview at issue. However, even if a person has not been arrested, advice of <u>Miranda</u> rights is required if there is a restraint on freedom of movement to the degree associated with a formal arrest. <u>Minnesota v. Murphy</u>, 465 U.S. 420, 430 (1984); <u>see also</u> <u>United States v.</u>

<u>Welsh</u>, 417 F.2d 361, 363 (5th Cir. 1969) ("We have held that an officer does not have to give these warnings until a person is in custody or until a person's freedom is deprived in some significant way.").[22]  Thus, the Court must determine if law enforcement restrained Mr. Castellanos to that degree,

In making that determination, "[t]he only relevant inquiry is how a reasonable man in [Mr. Castellanos's] position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).  The "custody" inquiry is objective; it is viewed from the perspective of the reasonable innocent person. <u>Florida v. Bostick</u>, 501 U.S. 429, 437-38 (1991); <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996). "[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>Moya</u>, 74 F.3d at 1119.  As explained by the Eleventh Circuit in <u>United States v. Luna-Encinas</u>, 603 F.3d 876 (11th Cir. 2010), "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment–and thus may be deemed to have been 'seized' by law enforcement–he will not necessarily be considered in 'custody' for Fifth Amendment purposes.'" <u>Id.</u> at 881.  Similarly,

---

[22] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc).

"[t]he fact that an investigation has focused on a suspect does not necessarily trigger the need for *Miranda* warnings." <u>United States v. Muegge,</u> 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam).

Factors the Court must consider in assessing whether a reasonable innocent person would have understood his freedom to have been curtailed to a degree associated with a formal arrest under the circumstances include, "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," <u>United States v. Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006) (citation and quotation marks omitted), and the location and length of the detention, <u>Luna-Encinas</u>, 603 F.3d at 881.

Here, Mr. Castellanos has not satisfied his burden to show that he spoke with law enforcement under circumstances equivalent to a formal arrest. First, there is no evidence that any officer brandished a weapon at Mr. Castellanos immediately prior to or during the interview. Although agents entered AMG with their guns drawn (for safety reasons), they holstered their weapons within one and a half minutes–when they received the "all clear" signal. (Tr. 75-76, 86-88.) Thus, even assuming the agents "seized" defendant while the AMG premises was secured, he was not formally arrested or in "custody." Moreover, the agents did not interview Mr. Castellanos until thirty

to forty minutes later (id. at 55, 62), and at no point during that discussion did agents display or threaten defendant with a firearm (id. at 35, 39, 60).

Second, the agents did not demand Mr. Castellanos speak with them or treat him in a manner that a reasonable innocent person would interpret as coercive. Rather, Agent Howard approached Mr. Castellanos (who was standing in a reception area), stated that the officers were executing a search warrant, and asked if he was willing to talk about AMG's business. (Tr. 18-20.) Mr. Castellanos agreed; Agent Howard asked if they could use a clinic office; Mr. Castellanos pointed to an open room and the men entered that office. (Id. at 20-21, 47.) Agent Howard asked defendant for permission to pat him down for weapons, but did not seize any of his belongings or place him in handcuffs. Mr. Castellanos (on his own) began to empty the contents of his pockets; Agent Howard told him to put away his possessions(including car keys and a cellular telephone). (Id. at 22-23.) Agent Howard then left the room to procure a recoding device and asked a deputy standing in the hallway to watch Mr. Castellanos to ensure that he did not hurt himself or destroy evidence. (Id. at 23-24.) Agent Howard left the office door open and did not direct the deputy to restrain Mr. Castellanos or state that he could not leave. (Id. at 24-25.) Indeed, defendant placed a telephone call in Agent Howard's absence. (Id. at 26.)

AO 72A
(Rev.8/82)

Third, agents interviewed Mr. Castellanos in a conversational, non-confrontational manner at a neutral location. At the outset of the recorded interview, Agent Howard specifically told defendant that he was not under arrest and that his participation was free and voluntary. (Tr. at 52, 55 & Gov't Ex. A.) Both Agent Howard and Mr. Castellanos repeatedly interrupted the interview to receive text messages and place telephone calls. (Id. at 30-34, 51, 54, 62-63 & Gov't Ex. A.) The interview was not lengthy, lasting approximately one hour, and took place in an AMG office during work hours. (Id. at 26 & Gov't Ex A.); see Muegge, 225 F.3d at 1269-71 (finding that the defendant was not in custody where his supervisor directed him to speak with investigators in a secure interview room with the door closed for more than two hours); see also Brown, 441 F.3d at 1348 (noting that "'[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings'") (quoting United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994)). Additionally, Mr. Castellanos never asked to end the interview or to leave the premises.[23] See Luca-Encinas, 603 F.3d at 882; United States v. Phillips,

_____

[23] Defendant's request to use the bathroom (after the interview ended), and his impression of the situation (revealed in a recorded telephone conversation twenty minutes after the interview) are irrelevant. See Moya, 74 F.3d at 1119 ("[T]he actual, subjective beliefs of the defendant . . . on whether the defendant was free to leave are irrelevant.")

29

812 F.2d 1355, 1362 (11th Cir.1987) (concluding that defendant was not in custody because, inter alia, he "never requested a lawyer or to terminate the interview").

For the reasons set forth above, the events leading up to the interview and the manner in which the agents conducted it "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004). Thus, based on the totality of the circumstances, Mr. Castellanos was not in custody, or restrained in a manner akin to formal arrest, when he made the statement at issue. Rather, "[t]he totality of the circumstances were such that a reasonable person in his position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." Id. Therefore, the agents were not obligated to advise Mr. Castellanos of his Miranda rights prior to the interview, and no Fifth Amendment violation occurred. Accordingly, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statement be **DENIED**.

## V. <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that both defendant's Motion to Suppress Statement [90] and Motion to Suppress Items Seized [91] be **DENIED**.

AO 72A
(Rev.8/82)

**SO RECOMMENDED,** this 25th day of June, 2012.

_Walter E. Johnson_

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)